# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANAVERDE LLC, | ) | Case No.: _____ |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF JOHN MILES, IN SUPPORT OF FIRST DAY MOTIONS

I, John Miles, hereby declare as follows:

1. I am the Project Manager for Brooks Street, managing member of Anaverde, LLC, the above-captioned debtor. From December 2006 through May 2008, I was employed by Empire Land, LLC, the former administrative member of Anaverde, LLC. While employed by Empire Land, LLC, I was the Project Manager for the Anaverde Project. Effective May 2008, I was hired by Brooks Street as the Project Manager for the Anaverde Project.

2. As the Project Manager, among my other job responsibilities, I am responsible for managing the Anaverde Project in Palmdale, California and the day to day operations of the Anaverde Project. I am responsible for receiving and approving proposals and contracts with any of the contractors, vendors or consultants for the project. Any invoices on the project are routed through me for review and approval. Part of my day to day duties includes maintaining knowledge and understanding of all contracts related to Anaverde.

3. To minimize the immediate adverse effects on the Debtor of filing for chapter 11 protection, the Debtor is filing a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motions (including the exhibits and other attachments thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtor to operate in Chapter 11 with minimum disruption or loss of value, (ii) is critical to the Debtor's

achievement of a successful sale; and (iii) best serves the Debtor's estate and the interest of the Debtor's creditors.

4. I submit this declaration (the "Declaration") in support of the First Day Motions.[1] Except as otherwise indicated, all statements set forth in this affidavit are based upon: (i) my personal knowledge, (ii) documents and other information prepared or collected by the management, employees, and professionals of the Debtor and/or Brooks Street, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtor.

5. Part I of this Declaration describes the Debtor's business, capital structure and the circumstances surround the commencement of this chapter 11 case. Part II sets forth the relevant facts in support of each First Day Motions.

## PART I

## OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS

6. The Debtor commenced this case by filing a voluntary petition on the date hereof (the "Petition Date"). The Debtor is continuing in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in this case and no official committee has yet been appointed by the U.S. Trustee.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

A. **Description of the Debtor's Business**

7. Anaverde owns a master-planned, partially entitled residential development in Palmdale, California. The Project, the second Phase of a larger development, includes approximately 3500 undeveloped lots and an adjacent development known as Chandar planned for 157 single family home sites (collectively, the "Project"). The Project is partially graded and has had some landscaping done, but is otherwise incomplete. No homes are yet built on the Project.

8. Due to the time sensitive nature of the Project and the various phases involved in its completion, an extensive delay in resumption of the maintenance activities at the site would cause the Debtor to incur further legal and financial liabilities and would threaten the viability of a Section 363 sale at the proposed price.

9. The California Department of Fish and Game issued permits to the Debtor are contingent on the Debtor conducting habitat mitigation and monitoring; the next report is due in March. These permits will be revoked if the owner of the Project is unable to fulfill its mitigation and monitoring obligations. The Debtor has no funds to perform these obligations.

10. Someone must take steps to secure the portions of the infrastructure of the Project to prevent deterioration due to exposure to the elements and/or erosion. This involves maintaining these sites as well as implementing various programs required by the federal and state government. More specifically, Anaverde encompasses approximately 25% of the total AV Anaverde Watershed. In the event of a severe 50/100 year storm event, the most downstream water basin will flood. In order to minimize the damage and potential harm it is necessary to develop a system of upstream basins to detain and slow water run-off through the watershed. Additionally, although grading of the 442 acres of Phase 2A was started, it remains incomplete.

Currently the topsoil and flora were completely removed, leaving a top layer of alluvial silt. Without plant material to hold the soil in place, a storm will cause significant erosion. The Debtor has no funds to perform these activities.

11. Due to its financial difficulties, the Project is unable to employ security guards and the Project is therefore vulnerable to theft, vandalism, and liability from trespassers.

12. The Debtor has been unable to construct a system of upstream detention basins for the Project. Its inability to do so increases the potential for flooding. The Debtor has no funds to construct these basins.

**B.      The Debtor's Relationship With Its Prepetition Lender**

13. In 2008, Anaverde entered into a loan agreement with Cadim Note, Inc. ("Cadim") in the principal amount of $77,350,328.56. Cadim was granted a lien on substantially all of Anaverde's assets. Cadim is owed approximately $63.9 million, which loan has been in payment default for over 10 months.

**C.      Background Regarding the Necessity for a Chapter 11 Filing**

14. The Project was calculated to be attractive to middle income homebuyers. The sub-prime crisis of 2008 has created conditions in which there is very little market appetite for the homes which were to be built on the Project site.

15. In 2009, Anaverde's representatives discovered that a spur of the San Andreas Fault runs through the Project, rendering infeasible much of the development anticipated at the site.

16. In light of the foregoing and other factors, the fair market value of the Project is now approximately $13 million.

17. As noted above, Anaverde's existing secured lender, Cadim is owed approximately $63.9 million, which loan has been in payment default for over 10 months. In addition, Anaverde has numerous other creditors, some of which have filed mechanics' liens against the property and lawsuits against Anaverde.

18. Outstanding bills from Anaverde's contractors and vendors total approximately $1.2 million.

19. A development of the Project will require a significant change in the development plan and the investment of large amounts of additional capital. In view of the project's now-limited fair market value and the enormous amount of senior liens encumbering the property, Anaverde is no longer able to attract capital to develop the Project.

20. As noted above, the residential real estate market in the Palmdale area is in extremely bad condition.

21. An undeveloped project adjacent to the Project, owned by Palmdale Hills Property LLC, has been in bankruptcy since November 2008. The Palmdale Hills project has approval for 7200 residential units. The Debtor in Palmdale Hills has not consummated any transaction for the sale of the Palmdale Hills project and remains in Chapter 11 proceedings.

22. Another undeveloped 900 acre project, Joshua Ranch, is across the street from the Project. The developer of Joshua Ranch defaulted on its loans and the Federal Deposit Insurance Corporation, which had taken over the failed lender, foreclosed on the property within the last year. There has been no sale of this undeveloped land.

23. In the last two years, there have been virtually no sales of undeveloped land of any kind in the Palmdale, California area, other than lender foreclosures and deed in lieu

transactions. There have been no sales of large undeveloped tracts such as the Project in the area in the last two years.

24. It is widely known that Anaverde is in default of its obligations to the Cadim and yet no party has approached the Debtor to inquire about acquisition of the property.

25. As a result of the foregoing, the Debtor determined that it could no longer operate outside of chapter 11.

### D. Negotiations with Cadim

26. Anaverde advised Cadim that it was considering filing for bankruptcy protection. A series of discussions and negotiations followed between Anaverde, Anaverde's equity investors, and Cadim in an attempt to reach an agreement as to how to proceed with such a bankruptcy filing.

27. On January 15, 2010, the Debtor filed its Plan of Liquidation (the "Plan") and Disclosure Statement with respect thereto (the "Disclosure Statement"). The Debtor's Plan contemplates that, following a Sale Process, a Sale Transaction will be approved by the Court in conjunction with approval of the Disclosure Statement and will be implemented through the Plan.

28. Anaverde believes that this Plan represents the best option available to it in light of the current markets and the Project's need for funding.

29. On January 15, 2010, the Debtor filed its Motion to establish a Sale Process for the sale of its assets.

# PART II

## FIRST DAY MOTIONS

**A. Motion For an Order (A) Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts and Business Form, (B) Granting an Interim and Final Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code and (C) Granting Related Relief**

30. By the Motion of the Debtor for an Order (A) Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts and Business Form, (B) Granting an Interim and Final Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code and (C) Granting Related Relief, the Debtor seeks authorization (1) to maintain its existing cash management system and bank accounts, (2) continue using existing business forms, and (3) a waiver of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code.

31. As set forth in more detail in the Motion, maintenance of the Bank Accounts and Cash Management System will greatly facilitate the Debtor's operations in chapter 11. To avoid disruptions and delays in the operation of the Debtor's business, the Debtor should be permitted to continue to maintain its existing Bank Accounts.

32. The Debtor will work closely with each bank to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court. The Debtor will also maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be documented in its books and records to the same extent such information was maintained by the Debtor prior to the Petition Date.

33. Permitting the Debtor to use its existing Bank Accounts and Cash Management System is in the best interests of the Debtor's estate and its creditors and other interested parties. It is critical that the Debtor be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate its business. Through the Cash Management System and the Prepetition Bank Accounts, the Debtor is able to effectively and efficiently collect, transfer, and disburse funds as needed in the Debtor's operations and to ensure the Debtor's ability to efficiently monitor and control all disbursements and movement of cash.

34. To require the Debtor to use new accounts would be disruptive to its business and would impair its efforts to maximize the value of its estate for the benefit of its creditors and parties in interest. Requiring the Debtor to adopt new, segmented cash management systems at this critical stage of this case would be expensive, would create unnecessary administrative burdens, and would be much more disruptive than productive, particularly in light of the Debtor's intention to file a motion for an order approving bidding procedures and a subsequent sale of substantially all of its assets.

35. The Debtor also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts. In accordance with existing practices, the Debtor will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of this case and will ensure that its records properly distinguish between pre- and post-petition transactions.

36. As set forth in more detail in the Motion, to minimize expense to the estate, the Debtor is requesting that they be allowed to continue to use its prepetition business forms, including but not limited to, letterhead, invoices, etc. without reference to its status as a debtor in possession. Requiring the Debtor to immediately print new business forms will be burdensome, expensive and disruptive to the Debtor's business.

37. As set forth in more detail in the Motion, the Debtor is also requesting that it be permitted to maintain its existing Bank Accounts even though they may, from time to time, exceed the amount insured by the Federal Deposit Insurance Corporation (the "FDIC"). A waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code is necessary to ensure the Debtor's smooth transition into chapter 11 and should pose no risk to its estate or its creditors. The Debtor's account balances in excess of FDIC insurance limits are maintained with banks that are financially stable. Requiring the Debtor to change its deposits and other procedures abruptly could result in harm to the Debtor, its estate and its creditors because it would disrupt its Cash Management System. In addition, requiring the Debtor to open multiple accounts at different banks so that the deposits in each such account would be insured by the FDIC would be unnecessarily burdensome.

**B. Debtor's Motion for an Order Authorizing the Retention and Payment of Professionals Utilized in the Ordinary Course of Business.**

38. As set forth in more detail in the Motion, in the ordinary course of its business, the Debtor employs certain legal and other professionals to render litigation services, provide legal advice and provide other services with respect to the Debtor's business operations. Many of these professionals have worked for the Debtor for a significant amount of time and are aware

of the Debtor's business and current issues involving the Debtor for which their services are necessary.

39. Although, these Ordinary Course Professionals will not be involved in the administration of the Chapter 11 case, their services may be needed during the pendancy of this case. If the expertise and background knowledge of certain of these Ordinary Course Professionals with respect to the particular areas and matters for which they were responsible prior to the Petition Date are lost, the estate undoubtedly will incur additional and unnecessary expenses finding substitute professionals. In addition, Ordinary Course Professionals have made progress on matters that could be jeopardized by delay or a mid-stream change of counsel.

40. Given the limited engagement of the Ordinary Course Professionals engaged by the Debtor, it would be unduly burdensome to require the Ordinary Course Professionals to apply to this Court for approval of their retention and/or the compensation owed by the Debtor. At the very least, requiring filing of fee applications by the Ordinary Course Professionals would increase the expenses of the estate, as the estate would be charged for the time spent by the Ordinary Course Professionals in preparing fee applications and by the estate's other professionals in reviewing and processing such fee applications. Moreover, the Ordinary Course Professionals are unfamiliar with the fee application process employed in a bankruptcy case and might be less inclined to work with the Debtor if they were forced to adhere to such requirements in order to be compensated for services rendered.

**C. Motion of Anaverde LLC for an Order (A) Fixing the Procedures and Deadline to File Proofs of Claim, (B) Approving the Form and Manner of Notice of Bar Dates, and (C) Granting Related Relief.**

41. As set forth in more detail above and in the Motion, the Debtor filed its Plan on the Petition Date and is seeking to sell its assets and confirm the Plan as soon as practicable. Establishing bar dates for the filing of proofs of claim will facilitate the Debtor's ability to proceed efficiently to confirmation of the Plan and subsequently consummate the Plan by making distributions to claim holders.

D. **Motion of Anaverde LLC For an Order: (A) Approving Procedures for the Sale of the Debtor's Assets, (B) Scheduling the Auction and Hearing to Consider Approval of Sale, (C) Approving Notice of Respective Dates, Times and Place For Auction and Hearing on Approval of (I) Sale and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Lease, (D) Approving the Form and Manner of Notice of Sale Process and of Approval Hearing, and (E) Granting Related Relief.**

42. As set forth in more detail in the Motion, assuming the DIP Financing is approve, the Debtor estimates that its cash and cash equivalents and the financing available under the DIP Financing will be sufficient to meet its cash needs through the completion of the Sale Process in April. Absent the Post-petition financing, which expires on May 1, 2010, Anaverde cannot fund its post-petition operations and obligations. As a result, time is of the essence in completing the Sale Process and concluding the Chapter 11 process.

43. Anaverde ran out of capital before all site stabilization activities necessary for the site to avoid damage by the elements were completed. If this restructuring is not promptly concluded, there may be further damage to the site, eroding its fair market value even further.

44. The Debtor has reached a deal with a buyer for the assets. However, to assure a sale prior to the expiration of the Post-Petition financing, it is necessary to commence the sale process immediately.

E. **Motion of Anaverde LLC to Approve Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 365, and 507: (I) Approving Secured PostPetition**

Financing; (2) Authorizing Use of Cash Collateral; (#) Granting Liens and Providing Superpriority Administrative Expense Status; (4) Granting Adequate Protection, (5) Modifying Automatic Stay; and (6) Scheduling a Final Hearing.

45. As set forth in more detail in the Motion, without access to the DIP Facility and the continued use of cash collateral, the Debtor lacks sufficient funds to pay administrative expenses or take any emergency actions necessary to maintain health and safety concerns at the Project. The Debtor's has an immediate and critical need to obtain financing under the DIP Facility in order to have sufficient funding to allow it to complete the sale of its assets. Access to the financing under the DIP Facility and the continued use of cash collateral is necessary to satisfy the Debtor's postpetition liquidity needs.

46. The Debtor has minimal cash collateral and does not anticipate receipt of significant cash collateral for the foreseeable future. The Debtor's sole source of credit is the DIP Facility funding. The DIP Lender is unwilling to make the loan to the Debtor on any terms other than those set forth in the DIP Financing.

47. The Prepetition Secured lender has consented to the Debtor entering into the DIP Facility.

I declare under penalty of perjury under the laws of the United States of America and the State Law of California that the foregoing is true and correct.

Dated this 15th day of January, 2010.

John Miles