## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ANAVERDE LLC | ) Case No. _____ |
| | ) |
| Debtor. | ) |
| | ) |

## MOTION OF ANAVERDE LLC TO APPROVE INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 365 AND 507: (1) APPROVING SECURED POSTPETITION FINANCING; (2) AUTHORIZING USE OF CASH COLLATERAL; (3) GRANTING LIENS AND PROVIDING SUPERPRIORTY ADMINISTRATIVE EXPENSE STATUS; (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING AUTOMATIC STAY; AND (6) SCHEDULING A FINAL HEARING

Anaverde LLC, a debtor and debtor in possession in the above- captioned case ("Anaverde" or the "Debtor"), hereby files this motion, pursuant to sections 105, 361, 362, 363, 364, and 365 of title 11 of the United States Codes (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an interim order on an expedited basis, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and ultimately, at a final hearing to be set by the Court (the "Final Hearing"), a final order as set forth herein (the "Final Order").

1.      The Debtor requests that the Interim and the Final Order include, without limitation, the following relief:

(A)     Authorizing the Debtor to obtain new money loans under a secured postpetition credit facility (the "DIP Facility"), pursuant to the terms of the Debtor in Possession Credit Agreement substantially in the form attached hereto as **Exhibit B** (the "DIP Credit Agreement"),[1] with New Anaverde LLC (the "DIP Lender") in the amount of up to $250,000

---

[1] All capitalized terms that are not expressly defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement, and any associated loan or collateral

upon entry of the Interim order, and in the amount of up to $700,000 upon entry of the Final order (together, the "Loan Commitment"), to finance working capital, capital expenditures, administrative expenses, and for other general corporate purposes of the Debtor;

(B)     Authorizing the Debtor to use the proceeds of the DIP Facility up to the Loan Commitment in accordance with the budget (the "DIP Budget") attached hereto as **Exhibit C**, as such budget may be revised or amended with the consent of the DIP Lender;

(C)     Authorizing the Debtor to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required thereby;

(D)     Granting security interest, liens (including priming liens pursuant to section 364(d) of the Bankruptcy Code), to New Anaverde LLC to secure all obligations of the Debtor under and with respect to the DIP Facility: (I) a perfected Lien, pursuant to Section 364(c)(3) of the Bankruptcy Code, upon the Debtor's Assets, the ALM Membership Interest and the Palmdale Membership Interest subject to the Lien of the Cadim Loan, that is junior in priority and payment to the Lien of the Cadim Loan; provided, however, that after Cadim has received an aggregate amount in respect of the Cadim Loan, from any source whatsoever, equal to the Cadim Payment, then the Lien of the Lender for repayment of the Loans and payment of other obligations hereunder shall be senior to the Lien of the Cadim Loan until the Loans are fully repaid and all such other obligations are fully paid, (II) a first priority, perfected Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon all of the Debtor's Assets that are not otherwise encumbered by a validly perfected lien or security interest, and (b) all of the Borrower's right, title and interest in, to and under (i) all proceeds of avoidance actions, and (ii) any rights under Section 506(c) of the Bankruptcy Code, (III)  an allowed superpriority

documents memorializing the DIP Facility with terms that substantially conform to the DIP Credit Agreement (the "DIP Facility Documents").

administrative expense claim in the Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code;

(E)     Authorizing the Debtor's limited use of cash collateral, as such term is defined in Section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in the Interim Order and the DIP Facility Documents;

(F)     Modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor and DIP Lender to implement the terms of this Order.

2.     The Debtor further requests that the Court (i) set an emergency interim hearing (the "Interim hearing") on the Motion for the Court to consider entry of the Interim Order, which authorizes the Debtor to borrow under the DIP Facility documents, on an interim basis, up to an aggregate principal amount not to exceed $250,000, (ii) schedule the Final Hearing on the Motion within thirty (30) days of the Petition Date (as hereinafter defined) to consider entry of the Final Order authorizing the balance of the borrowings under the DIP Facility Documents and authorizing the Debtor to use cash collateral in accordance with the DIP Budget on a final basis, and (iii) approve notice procedures with respect thereto.

3.     Notice of the Interim Hearing has been given to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) counsel to Cadim Note Inc., the pre-petition secured lender, (iii) all other parties with liens of record on assets of the Debtor as of the Petition Date, and (iv) the Debtor's twenty largest unsecured creditors, as identified on in the Chapter 11 petition.  The Debtor submits that such notice was good and sufficient under the circumstances and no other or further notice is or shall be required.

In support of this Motion, the Debtor relies upon the Declaration of John Miles in Support of the First Day Motions and respectfully represents as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this motion pursuant to sections 157 and 1334 of title 28 of the United States Code (the "Judicial Code"). Venue of this proceeding and this Motion is proper in this District pursuant to 8 U.S.C. §§ 1408 and 1409.

2. This is a core proceeding pursuant to section 157(b)(2) of the Judicial Code.

**3.** The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

4. On January 15, 2010 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code.

5. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing in the management and possession of its properties as a debtor in possession.

6. No trustee or examiner has been appointed in this chapter 11 case.

## DESCRIPTION OF THE DEBTOR'S BUSINESS

7. Anaverde owns a master-planned, partially entitled residential development in Palmdale, California. The Project, the second Phase of a larger development, includes approximately 3500 undeveloped lots and an adjacent development known as Chandar planned for 157 single family home sites (collectively, the "Project"). The Project is partially graded and has had some landscaping done, but is otherwise incomplete. No homes are yet built on the Project.

8. Due to the time sensitive nature of the Project and the various phases involved in its completion, an extensive delay in resumption of the maintenance activities at the site would cause the Debtor to incur further legal and financial liabilities and would threaten the viability of a Section 363 sale at the proposed price. We summarize below some of the issues that would be caused by further delays in the Project.

9. The California Department of Fish and Game issued permits to the Debtor are contingent on the Debtor conducting habitat mitigation and monitoring; the next report is due in March. These permits will be revoked if the owner of the Project is unable to fulfill its mitigation and monitoring obligations. The Debtor has no funds to perform these obligations.

10. Someone must take steps to secure the portions of the infrastructure of the Project to prevent deterioration due to exposure to the elements and/or erosion. This involves maintaining these sites as well as implementing various programs required by the federal and state government. More specifically, Anaverde encompasses approximately 25% of the total AV Anaverde Watershed. In the event of a severe 50/100 year storm event, the most downstream water basin will flood. In order to minimize the damage and potential harm it is necessary to develop a system of upstream basins to detain and slow water run-off through the watershed. Additionally, although grading of the 442 acres of Phase 2A was started, it remains incomplete. Currently the topsoil and flora were completely removed, leaving a top layer of alluvial silt. Without plant material to hold the soil in place, a storm will cause significant erosion. The Debtor has no funds to perform these activities.

11. Due to its financial difficulties, the Project is unable to employ security guards and the Project is therefore vulnerable to theft, vandalism, and liability from trespassers.

12.     The Debtor has been unable to construct a system of upstream detention basins for the Project. Its inability to do so increases the potential for flooding. The Debtor has no funds to construct these basins.

## BACKGROUND REGARDING THE RESTRUCTURING

13.     The Project was calculated to be attractive to middle income homebuyers. The sub-prime crisis of 2008 has created conditions in which there is very little market appetite for the homes which were to be built on the Project site.

14.     In 2009, Anaverde's representatives discovered that a spur of the San Andreas Fault runs through the Project, rendering infeasible much of the development anticipated at the site.

15.     In light of the foregoing and other factors, the fair market value of the project is now approximately $13 million.

16.     Anaverde's existing secured lender, Cadim Note, Inc. ("Cadim") is owed approximately $63.9 million, which loan has been in payment default for over 10 months. In addition, Anaverde has numerous other creditors, some of which have filed mechanics' liens against the property and lawsuits against Anaverde.

17.     A development of the Project will require a significant change in the development plan and the investment of large amounts of additional capital. In view of the project's now-limited fair market value and the enormous amount of senior liens encumbering the property, Anaverde is no longer able to attract capital to develop the Project.

18.     As noted above, the residential real estate market in the Palmdale area is in extremely bad condition.

19. An undeveloped project adjacent to the Project, owned by Palmdale Hills Property LLC, has been in bankruptcy since November 2008. The Palmdale Hills project has approval for 7200 residential units. The Debtor in Palmdale Hills has not consummated any transaction for the sale of the Palmdale Hills project and remains in Chapter 11 proceedings.

20. Another undeveloped 900 acre project, Joshua Ranch, is across the street from the Project. The developer of Joshua Ranch defaulted on its loans and the Federal Deposit Insurance Corporation, which had taken over the failed lender, foreclosed on the property within the last year. There has been no sale of this undeveloped land.

21. In the last two years, there have been virtually no sales of undeveloped land of any kind in the Palmdale, California area, other than lender foreclosures and deed in lieu transactions. There have been no sales of large undeveloped tracts such as the Project in the area in the last two years.

22. It is widely known that Anaverde is in default of its obligations to the Cadim and yet no party has approached the Debtor to inquire about acquisition of the property.

23. Anaverde advised Cadim that it was considering filing for bankruptcy protection. A series of discussions and negotiations followed between Anaverde, Anaverde's equity investors, and Cadim in an attempt to reach an agreement as to how to proceed with such a bankruptcy filing.

24. Cadim, Anaverde, and Anaverde's equity investors have reached an agreement whereby Anaverde would file for bankruptcy and seek to confirm a plan of liquidation that would be funded by a sale of Anaverde's assets pursuant to 11 U.S.C. §363, free and clear of all liens, to New Anaverde, an entity formed by some of Anaverde's equity investors. Cadim would support a Sale Transaction and Plan from which, notwithstanding its senior security position, it

would take only a maximum of about $12 million, waive its unsecured claims, and gift $350,000 to the other unsecured creditors.

25. More specifically, pursuant to the Plan Support Agreement, Anaverde agreed to, among other things:

A. File and pursue the Plan which provides for payments to Cadim on account of Cadim's Secured Claim equal to the sum of:

(1) $10,475,000 from the Sale Transaction;[2]

(2) an amount equal to 12% per annum, compounded annually, on $10,125,000 from December 24, 2009 until $10,125,000 is disbursed to Cadim, in no event more than $984,699;

(3) unreimbursed reasonable fees and expenses of Cadim's counsel in pursuing the Plan, but in no event more than $383,000; and

(4) A "schmuck insurance" right, payable in the future if at all, to 25% of the cash profits from sales of land included in the Project which (1) are received by New Anaverde during the two-year period immediately following consummation of the Plan, and (2) exceed the sum of (a) $26,700,000, (b) an amount equal to 12% per annum, compounded annually, on $10,125,000 from December 24, 2009 to the time the $10,125,000 payment to Cadim is made, (c) any other amounts paid to Cadim (for fees and expenses of its counsel or otherwise) pursuant to this Agreement, the Plan or any Alternative Plan, (d) any other amounts paid by New Anaverde in connection with the Bankruptcy Case, whether through the Plan, the DIP Financing or otherwise, and (e) any other out-of-pocket cost paid, or investments made, by Anaverde or New Anaverde after November 30, 2009, which are related to the Project. Due to the state of the real estate market, this option is thought to be of only nominal value.

---

[2] Cadim has agreed to gift to the unsecured creditors (i.e. the members of the Convenience Class and the General Unsecured Creditors), the next $350,000 of cash proceeds from the Sale Transaction which would otherwise be payable to Cadim for its Secured Claim.

**B.** So long as the conditions of the Plan Support Agreement are satisfied, Cadim, agreed:

(1) to gift to the unsecured creditors (i.e. the members of the Convenience Class and the General Unsecured Creditors), $350,000 of cash proceeds from the Sale Transaction which would otherwise be payable to Cadim for its Secured Claim,

(2) that it will support and vote in favor of the Plan,

(3) to credit bid as much of the Cadim Loan as New Anaverde shall request,

(4) waive the right to receive any further payment with respect to its claims against Anaverde,

(5) release any liens or security interests it has in the Anaverde assets,

(6) accept, in full satisfaction, settlement, release and discharge of Cadim's Secured Claims, the Cadim Payment.

26. On January 15, 2009, the Debtor filed its Plan of Liquidation (the "Plan") and Disclosure Statement with respect thereto (the "Disclosure Statement"). The Debtor's Plan contemplates that, following a Sale Process, a Sale Transaction will be approved by the Court in conjunction with approval of the Disclosure Statement and will be implemented through the Plan.

27. Anaverde believes that this Plan represents the best option available to it in light of the current markets and the Project's need for funding.

## THE PREPETITION CREDIT FACILITIES

28. In 2008, Anaverde entered into a loan agreement with Cadim in the principal amount of $77,350,328.56. Cadim was granted a lien on substantially all of Anaverde's assets. The current outstanding balance on the Cadim loan is approximately $63.9 million. As explained

above, an agreement has been negotiated whereby Cadim will release Anaverde from any and all liability related to the Cadim Note.

29. Outstanding bills from Anaverde's contractors and vendors total approximately $1.2 million.

## NEED FOR THE DIP FACILITY AND USE OF CASH COLLATERAL

30. The Debtor believes it has an immediate and critical need to obtain postpetition financing under the DIP Facility and to use cash collateral in order to reorganize the Debtor's financial structure and/or to sell certain of the Debtor's assets. The Debtor's access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Facility and the use of cash collateral is vital to maximizing the value of the Debtor's estate. Without access to the DIP Facility and the continued use of cash collateral, the Debtor lacks sufficient funds to pay administrative expenses or even take emergency actions to maintain health and safety concerns at the Project. As a result, without the DIP Facility, the estate would suffer immediate and irreparable harm and would have no option but to convert this case to one under Chapter 7.

31. The Debtor has minimal Cash Collateral and does not anticipate receipt of significant Cash Collateral for the foreseeable future. The Debtor is unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtor's estate under section 364(c)(2) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtor, other than the use of cash collateral, is

the DIP Facility. The Debtor requires both additional financing under the DIP Facility and the continued use of cash collateral in order to satisfy its postpetition liquidity needs.

32.     The DIP Lender has indicated a willingness to provide the Debtor with certain financing to preserve the Project pending a prompt sale pursuant to 11 U.S.C. §363, but solely on the terms and conditions set forth in the DIP Facility Documents. After considering all of its alternatives, the Debtor has concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Facility Documents represents the best financing presently available to the Debtor.

33.     The Prepetition Lender is prepared to consent to: (a) the imposition of certain liens under section 364(d)(1) of the Bankruptcy Code in favor of the DIP Lender, such liens will prime all other liens except they will be junior in priority and payment to the Cadim Loan until such time as Cadim receives an aggregate amount equal to the Cadim Payment at which point the liens granted to the DIP Lender shall be first priority liens and (b) the Debtor's use of cash collateral in accordance with the DIP Budget.

34.     The Debtor has negotiated the DIP Credit Agreement and the DIP Facility Documents in good faith. The Debtor believes that the terms of the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with the fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

## SUMMARY OF DIP FACILITY

35.     The following is a summary of the key terms of the DIP Facility Documents, the Interim Order and the Final Order.[3] The proposed form of the Final Order will provided for a

---

[3] To the extent there is any discrepancy between the summary herein and the DIP Facility Documents, the Interim Order or the Final Order, the terms of the DIP Facility Documents, the Interim Order or the Final Order, respectively, shall govern.

waiver of surcharge rights under section 506(c) of the Bankruptcy Code. The key provisions of the DIP Credit Agreement are further summarized below:

| | |
|---|---|
| **Borrower:** | Anaverde LLC |
| **DIP Lender:** | New Anaverde, LLC |
| **DIP Credit Facility / Commitment** | The DIP Credit Agreement provides for a credit commitment of up to a total of $250,000 upon entry of the Interim Order and up to a total of $700,000 on entry of the Final Order. *DIP Credit Agreement section 2.1.* |
| **Term / Maturity:** | The Loans shall mature, and the full amount due thereunder shall be due and payable on the earliest to occur of (i) May 1, 2010, (ii) such date as the Loans are accelerated by Notice of Acceleration given pursuant to Section 7.2 of the DIP Credit Agreement (iii) the date the Bankruptcy Court enters an order denying the motion for sale of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code; (iv) the date the Bankruptcy Court issues an order denying approval of the Disclosure Statement; and (v) the date on which the Debtor has consummated a sale of substantially all of its assets pursuant to Section 363 of the Bankruptcy Code. *DIP Credit Agreement section 2.5.* |
| **Interest and Fees:** | Interest accrues at the rate of seventeen percent (17%) per annum, compounded monthly, but not more than the maximum rate permitted under applicable law and will be capitalized and added to the principal of the loan. If all or any portion of (i) any principal of any Loan, (ii) any interest payable thereon or (iii) any other amount payable hereunder shall not be paid when due (whether at stated maturity, by acceleration or otherwise), the principal of the Loan and any such overdue interest or other amount shall bear interest at a rate of 19%, which shall be capitalized and added to the principal of the Loan during the period prior to the time Cadim has received an aggregate amount in respect of the Cadim Loan, from any source whatsoever, equal to the Cadim Payment, and thereafter is payable on demand. *DIP Credit Agreement section 2.6.* |
| **Expenses & Indemnification:** | The Debtor has agreed to reimburse and/or indemnify the DIP Lender for certain expenses and/or fees incurred by the DIP Lender as set forth in section 8.5 of the DIP Credit Agreement. |
| **Use of Proceeds:** | The proceeds of the loans will be used to pay the |

| | |
|---|---|
| | expenses incurred by the Debtor's estate in the ordinary course of business, consistent with amounts set forth in the DIP Budget, and to pay the fees and expenses of DIP Lender and its counsel, in all cases subject to the terms of the DIP Credit Agreement, and orders of the Bankruptcy Court. The Debtor shall not use the proceeds of any Loan for any purpose other than payment of the expenses of the estate and expenses incurred by the Debtor in the ordinary course of business consistent with the Budget, and the fees and expenses of DIP Lender and its counsel. *DIP Credit Agreement Sections 2.3(b) and 6.4.* |
| **Security:** | All obligations will be secured by:<br><br>(1) a first priority, perfected Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon (1) all of the Debtor's assets that are not otherwise encumbered by a validly perfected lien or security interest; (2) proceeds of avoidance actions, and (3) any rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof.<br><br>(2) a perfected Lien, pursuant to Section 364(c)(3) of the Bankruptcy Code, upon the Debtor's assets, and the membership interests of the equity investors in the Debtor, encumbered by the Lien of the Cadim Loan, that is junior in priority and payment to the Lien of the Cadim Loan; provided, however, that after Cadim has received an aggregate amount in respect of the Cadim Loan, from any source whatsoever, equal to the Cadim Payment, then the DIP Lien of the DIP Lender for repayment of the Loans and payment of other obligations hereunder shall be senior to the Lien of the Cadim Loan until the Loans are fully repaid and all such other obligations are fully paid.<br><br>(3) to the extent specified in Section 3 of the DIP Credit Agreement, an allowed Super priority Claim from administrative expenses in the Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.<br><br>The Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens by operation of law without the necessity of any further action by the DIP Lender or filing or recording any |

| | |
|---|---|
| | financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized to file, as it deems necessary or advisable in their sole discretion, such financing statements, mortgages, notices and other instrument or documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, evidence or perfect the DIP Liens. The Debtor is authorized and directed to execute and deliver promptly upon demand to the DIP Lender, all such financing statements, mortgages, titles insurance policies, notices, instruments, and other documents as the DIP Lender may reasonably request. The DIP Lender, may in its sole discretion, file a photocopy of this Interim Order as a financing statement or notice with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, mortgages, notices of lien, instrument, or similar document. *DIP Credit Agreement Section 2.11* |
| **Mandatory Prepayments:** | Immediately upon the Bankruptcy Court entering an order: (i) directing the appointment of a trustee in the Case pursuant to Section 1104(a) of the Bankruptcy Code; (ii) converting the Case to a case under Chapter 7 of the Bankruptcy Code; (iii) dismissing the Case; or (iv) modifying or terminating the Debtor's exclusive right to file or solicit acceptances of a Liquidation Plan. *DIP Credit Agreement section 2.8.* |
| **Application of Proceeds of Collateral/Payments:** | All payments (including prepayments) on the Loans or on any of the other Obligations shall be made to the DIP Lender for application against the Debtor's Obligations as follows: first to then due and outstanding fees, expenses or other charges of the DIP Lender under the DIP Credit Agreement or any of the other Loan |

| | |
|---|---|
| | Documents to the extent payable by the Debtor; second to then due interest on the Loans accrued and unpaid prior to the date such funds are received by the DIP Lender; and third to the principal balance of the Loans. *DIP Credit Agreement section 2.9(b)*. |
| **Events of Default and Certain Prohibitions** | Events of Default include, without limitation, the following:<br><br>(i) the Debtor shall fail to make a timely payment of principal on any loan within five (5) days after any such other amount becomes due<br>(ii) the dismissal of the Case or the conversion of the Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code;<br>(iii) the Bankruptcy Court enters an order denying the Final Order, or vacating the Interim Order or the Final Order, or modifying the Interim Order or Final Order without the consent of the DIP Lender;<br>(iv) any warranty made or deemed made by the Debtor, ALM, or Palmdale shall prove to have been incorrect in any material respect on or as of the date made or deemed made;<br>(v) the Debtor, ALM, or Palmdale shall cease to be in material compliance with any covenant made or deemed made by it;<br>(vi) the Debtor, ALM, or Palmdale shall default in the observance or performance of any other undertaking required by the DIP Credit Agreement or Loan Documents and such default shall continue unremedied for a period of ten (10) days after written notice thereof to the Debtor, ALM, or Palmdale;<br>(vii) the Borrower obtains or causes to be entered an order of the Bankruptcy Court or court of competent jurisdiction (i) obtaining additional financing or incurring additional indebtedness;<br>(viii) the Debtor takes any actions that are adverse to the DIP Lender's rights and remedies in the DIP Credit Agreement or interests in the Collateral that would have a materially adverse effect;<br>(ix) the appointment of an interim or permanent trustee in the Case or the appointment of an examiner (or any other Person) in the Case with the power to operate or manage the financial affairs, the business, or liquidation of the Debtor;<br>(x) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of |

| | |
|---|---|
| | Section 362(1) of the Bankruptcy Code to allow any creditor to execute upon, enforce or perfect a Lien on any Collateral, or (ii) with respect to any Lien of, or the granting of any lien on, any Collateral to any governmental agency;<br><br>(xi) the entry of an order by the Bankruptcy Court or a court of competent jurisdiction (i) reversing, staying, vacating, or rescinding or (ii) amending, supplementing or otherwise modifying either of the Orders without consent of the Lender;<br><br>(xii) the commencement by the Debtor, ALM, or Palmdale or a committee of a suit, action or other proceeding against the DIP Lender that asserts: (i) an objection to the allowance of the DIP Lender's claims against the Debtor; (ii) an avoidance action against the DIP Lender; (iii) any cause of action or claim which seeks to reduce, limit, defend against, setoff, counterclaim, or subordinate the Debtor's Obligations or other indebtedness to the DIP Lender, challenge or affect the validity, extent, or priority of the DIP Lender's security interest in the Collateral, or assert or recover any legal or equitable remedy against the DIP Lender, with the exception of actions to enforce the DIP Credit Agreement or the Orders;<br><br>(xiii) any of the Security Documents shall cease, for any reason, to be in full force and effect, or the Debtor shall so assert in writing, or (ii) the Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby;<br><br>(xiv) the Debtor shall file a Liquidation Plan that does not provide for payment of the Loans in full on or before the date the Liquidation Plan is to be effective, without the DIP Lender's written consent;<br><br>(xv) the sale of all or substantially all of the stock (or other ownership interests) or assets (other than pursuant to the Section 363 sale) of, or the merger or business combination of, the Debtor without the consent of the Lender; or<br><br>(xvi) or any other default by the Debtor that remains uncured for a period of ten (10) days after notice thereof *DIP Credit Agreement section 7.1.* |
| **Remedies** | DIP Lender may upon three days notice to the Debtor, ALM, or Palmdale and any statutory committee of unsecured creditors, if any, apply to the Bankruptcy |

| | |
|---|---|
| | Court for relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code in order to exercise all rights under the DIP Credit Agreement, including its right to (i) terminate the Commitment and thereafter cease to make Loans to the Borrower; (ii) accelerate the loan, (iii) take any other action or exercise any other right, power or remedy permitted to the DIP Lender under the Loan Documents, the Orders or by operation of law, including, without limitation, its right to foreclose on the Collateral.<br>*DIP Credit Agreement section 7.2.* |
| **Conditions Precedent to Funding:** | (1) The DIP Lender shall have received the DIP Credit Agreement, and such other Loan Documents as the DIP Lender shall require, in form and substance reasonably satisfactory to the DIP Lender, executed and delivered by a duly authorized representative of the Debtor, ALM, and/or Palmdale.<br>(2) The Debtor, ALM, and Palmdale shall have complied with all proceeding and execution requirements as applicable to the Debtor specified in the Interim Order.<br>(3) The DIP Lender and its counsel shall have received all fees and expenses owing from the Debtor through such date. The DIP Lender may add such fees and expenses to the principal of the Loan.<br>(4) The Bankruptcy Court shall have entered the Interim Order pursuant to Sections 363 and 364 of the Bankruptcy Code, and such Interim Order shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect.<br>(5) The Debtor shall have filed a motion, pursuant to Sections 363(b)(1) and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9006, for an order approving bid procedures and the form and manner of notice of the sale process in connection with the sale of the Collateral to the DIP Lender under 11 U.S.C. § 363 contemplated by the Plan of Liquidation.<br>(6) The Debtor shall have filed, pursuant to Section 1125 of the Bankruptcy Code, a motion for an order approving the disclosure statement, establishing voting procedures and setting a date for confirmation of a plan.<br>(7) The Debtor shall have filed a motion, pursuant to Section 327 of the Bankruptcy Code, for an order authorizing the retention of estate professionals.<br>(8) If the Bankruptcy Court shall have entered the Final Order pursuant to Section 364 of the Bankruptcy Code, |

| | such Final Order shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect. |
| | (9) Written consent of Cadim to the Lien in the Collateral granted to the DIP Lender by the Debtor, ALM, and Palmdale in the DIP Credit Agreement. The DIP Lender and the Debtor, ALM, and Palmdale may continue to rely upon the consent given by Cadim prior to the initial Loan, and will not have to obtain separate consent from Cadim for each subsequent Loan. This condition cannot be waived or otherwise circumvented without the express written approval of Cadim. |
| | (10) Each of the warranties made by the Debtor, ALM, and Palmdale in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date. |
| | (11) No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date. |
| | (12) All company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by the DIP Credit Facility and the other Loan Documents shall be satisfactory in form and substance to the DIP Lender. |
| | (13) The DIP Lender shall have received a Borrowing Certificate with the amount of the specific borrowing filled in. |
| | *DIP Credit Agreement Section 4.1.* |

36.     If the Interim Order is granted, but the Final Order is denied, the provisions of the Interim Order will remain in effect as to advances made prior to the denial of the Final Order. Those provisions include, without limitation, (i) the perfected security interest granted to the DIP Lender, (ii) the Events of Default listed above and (iii) the Remedies available to the DIP Lender listed above.

## RELIEF REQUESTED

37.     The Debtor requires financing and authority to use cash collateral to fund, among other things, the Debtor's cash requirements for working capital and general corporate needs.

The Debtor is unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under section 364(c) or section 364 (d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Facility Documents. A loan facility in the amount and in the manner provided by the DIP Facility Documents is not available to the Debtor, generally, without granting to the DIP Lender, pursuant to section 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, the benefits set forth in the DIP Facility Documents. After considering all alternatives, the Debtor has concluded in the exercise of its prudent business judgment that the loan facility provided under the DIP Facility Documents represents the best working capital financing available to them. Hence, the Debtor requests approval of the DIP Facility and authority to use cash collateral to maintain their going concern operations and maximize the value of its estate.

## BASIS FOR RELIEF REQUESTED

### A.     Debtor-in-Possession Financing

38.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

39.     Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

    (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

    (2) secured by a lien on property of the estates that is not otherwise subject to a lien; or

    (3) secured by a junior lien on property of the estates that is subject to a lien.

11 U.S.C. § 364(c).

40.    The Debtor satisfies the requirements of section 364(c) of the Bankruptcy Code because the Debtor is unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estate.

41.    In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames Dept. Stores*, 115 B.R. at 40 (finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions).

42.    Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D.Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered

from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the Debtors' approach of only four lenders was sufficient under such circumstances. See also *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) (satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (element satisfied where "specialist in commercial lending practices...explained that most banks lend money only in return for secured position. The debtor cannot obtain financing secured by a lien on unencumbered property...because there is not property in the estate which is not already subject to a lien.").

43.     In order for the Debtor to achieve the necessary liquidity to maintain operations, the Debtor must have access to the DIP Facility. The Debtor has not been able to obtain postpetition financing on an unsecured basis, pursuant to sections 364(a) or 364(b) of the Bankruptcy Code. Similarly, the Debtor has sought, but has been unable to obtain, postpetition financing under section 364(c) of the Bankruptcy Code in amounts sufficient to provide the Debtor with the necessary liquidity, other than secured by liens under section 364 of the Bankruptcy Code such as those set forth in the DIP Facility.

44.     Hence, the Debtor is unable to obtain financing from other capital sources. No other lender or capital source will provide the Debtor with postpetition financing on terms equal or more favorable to the estate than the proposed DIP facility under the circumstances.

45.     The Debtor further submits that the terms and conditions of the DIP Facility are the best possible under the circumstances of this case, and was negotiated in good faith and at arm's length with all parties represented by experienced counsel. Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code,

such that if any of the provisions of the DIP Facility are later modified, vacated, or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

## B.    Use of Cash Collateral

46.    The Debtor's use of property of the estate is governed by section 363 of the Bankruptcy Code. Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section…1108…of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estates, in the ordinary course of business, without notice or hearing, and may use property of the estates in the ordinary course of business without notice or hearing.

11 U.S.C. § 363(c)(1).

47.    The Bankruptcy Code establishes a special requirement, however, regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estates and an entity other than the estates have an interest…." 11 U.S.C. § 363(a). Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances exist:

> (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363 (c)(2).

48.    Here, the Prepetition Lender and the DIP Lender consent to the Debtor's use of cash collateral on the terms set forth in the DIP Budget and this Motion.

## INTERIM AUTHORIZATION

49. The authorization to obtain the DIP Facility and use of cash collateral pending a final hearing will preserve the value of the Debtor's business only if authorization is granted immediately.

50. Delaware Bankruptcy Rule 4001-2(b) specifically contemplates that it might be necessary to grant interim authorization to obtain postpetition financing or use of cash collateral because of the business exigencies of individual cases. *See also* 11 U.S.C. § 102(1) (defining "after notice and a hearing" to mean after such notice and such opportunity for a hearing as is appropriate in the particular circumstances of a given case).

51. In this instance, the Debtor must have immediate use of the DIP Facility and cash collateral in order to pay their ongoing operational expenses, including costs and expenses of administration of this bankruptcy case, and to maximize the value of its estate. Funds are urgently needed to meet the Debtor's liquidity needs and to administer these cases in an orderly manner. In the absence of immediate postpetition financing, the Debtor's ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtor's estate.

52. The Debtor seeks authorization on an interim basis to borrow up to $250,000 in new money under the DIP Facility and to use cash collateral for the purposes set forth in the DIP Budget pending the Final Hearing.

53. Based on the foregoing, the Debtor submits that interim relief requested in this Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtor, its estate, and its creditors.

**NOTICE**

**A.    Notice With Respect to Emergency Interim Financing Request**

54.    The Debtor has provided notice of the Motion and the Interim Hearing by facsimile or overnight mail to: (i) the U.S. Trustee, (ii) counsel to Cadim Note, Inc., the Prepetition Lender; (iii) all other parties with liens of record on assets of the Debtor as of the Petition Date; and (iv) the Debtor's 20 largest unsecured creditors as identified in their chapter 11 petitions. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**B.    Notice With Respect to Final Order**

55.    Upon entry of the Interim Order, the Debtor shall give notice of the request for entry of a Final Order to: (i) the U.S. Trustee, (ii) counsel to Cadim Note, Inc., the Prepetition Lender; (iii) all other parties with liens of record on assets of the Debtor as of the Petition Date; and (iv) the Debtor's 20 largest unsecured creditors as identified in their chapter 11 petitions; and (v) all other parties requesting notice pursuant to Bankruptcy Rule 2002.

**NO PRIOR REQUEST**

56.    No previous application for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE the Debtor requests that the court (i) approve the DIP Facility and the use of cash collateral on an interim basis; (ii) approve the proposed Interim Order, (iii) schedule a Final Hearing on this Motion thirty (30) days of the Petition Date to consider approval of the DIP Facility and use of cash collateral on a final basis; (iv) grant final approval of the DIP Facility and use of cash collateral following the Final Hearing; and (v) grant such further relief as is just and proper.

-24-

Dated: January 15, 2010

CROSS & SIMON, LLC

_[signature]_

Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
913 N. Market St.
11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
Ph: (302) 777-4200
Fax: (302) 777-4224
kmann@crosslaw.com

*Proposed Counsel for Debtor and Debtor in
Possession*