IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ANAVERDE LLC | ) Case No. _____ |
| | ) |
| Debtor. | ) **Proposed Hearing Date: tbd** |
| | ) **Objections Due: tbd** |

### MOTION OF ANAVERDE LLC FOR AN ORDER: (A) APPROVING PROCEDURES FOR THE SALE OF THE DEBTOR'S ASSETS, (B) SCHEDULING AUCTION AND HEARING TO CONSI DER APPROVAL OF SALE, (C) APPROVING NOTICE OF RESPECTIVE DATES, TIMES AND PLACES FOR AUCTION AND HEARING ON APPROVAL OF (I) SALE AND (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF NOTICE OF SALE PROCESS AND OF APPROVAL HEARING, AND (E) GRANTING RELATED RELIEF

Anaverde LLC, a debtor and debtor in possession in the above- captioned case ("Anaverde" or the "Debtor"), hereby files this motion, pursuant to sections 105(a), 363, 365, 1107 and 1108 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order (a) approving procedures to govern the process for the sale (the "Sale Procedures"), including the Breakup Fee as set forth below and in the asset purchase agreement (the "Agreement") between the Debtor and New Anaverde LLC (the "Stalking Horse Purchaser"), with respect to the sale as a going concern, of all or substantially all of the assets of Anaverde (the "Sale"), by direct sale (the "Sale Transaction"), (b) scheduling an auction (the "Auction") and hearing to consider approval of the sale (the "Sale Hearing") which will be implemented pursuant to a plan of liquidation, (c) approving the notice of respective dates, times,

1

and places for (i) the Auction, (ii) the Sale Hearing, (iii) the assumption and assignment of certain executory contracts and unexpired leases; (d) approving forms and manner of notice, and (e) granting related relief (the "Procedures Motion"). In support of this Motion, the Debtor respectfully represents as follows:

## INTRODUCTION

1.     The Debtor proposes to sell all or substantially all of its assets in an Auction. The Debtor is seeking bids from any interested purchasers of those assets.

## JURISDICTION

2.     The Court has jurisdiction over the Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N), and (O).

3.     Venue of these proceedings and the Procedures Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory predicates for the relief sought herein are sections 105(a), 363, 365, 1107 and 1108 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9006 and 9014 of the Bankruptcy Rules, and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules.

## BACKGROUND

5.     On January 15, 2010 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code.

6.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing in the management and possession of its properties as a debtor in possession.

7.     No trustee or examiner has been appointed in this chapter 11 case.

1/14/10 10:20 PM

## DESCRIPTION OF THE DEBTOR'S BUSINESS

8.     Anaverde owns a master-planned, partially entitled residential development in Palmdale, California. The Project, the second Phase of a larger development, includes approximately 3500 undeveloped lots and an adjacent development known as Chandar planned for 157 single family home sites (collectively, the "Project"). The Project is partially graded and has had some landscaping done, but is otherwise incomplete. No homes are yet built on the Project.

9.     Due to the time sensitive nature of the Project and the various phases involved in its completion, an extensive delay in resumption of the maintenance activities at the site would cause the Debtor to incur further legal and financial liabilities and would threaten the viability of a Section 363 sale at the proposed price. We summarize below some of the issues that would be caused by further delays in the Project.

10.     The California Department of Fish and Game issued permits to the Debtor are contingent on the Debtor conducting habitat mitigation and monitoring; the next report is due in March. These permits will be revoked if the owner of the Project is unable to fulfill its mitigation and monitoring obligations. The Debtor has no funds to perform these obligations.

11.     Someone must take steps to secure the portions of the infrastructure of the Project to prevent deterioration due to exposure to the elements and/or erosion. This involves maintaining these sites as well as implementing various programs required by the federal and state government. More specifically, Anaverde encompasses approximately 25% of the total AV Anaverde Watershed. In the event of a severe 50/100 year storm event, the most downstream water basin will flood. In order to minimize the damage and potential harm it is necessary to

develop a system of upstream basins to detain and slow water run-off through the watershed. Additionally, although grading of the 442 acres of Phase 2A was started, it remains incomplete. Currently the topsoil and flora were completely removed, leaving a top layer of alluvial silt. Without plant material to hold the soil in place, a storm will cause significant erosion. The Debtor has no funds to perform these activities.

12.     Due to its financial difficulties, the Project is unable to employ security guards and the Project is therefore vulnerable to theft, vandalism, and liability from trespassers.

13.     The Debtor has been unable to construct a system of upstream detention basins for the Project. Its inability to do so increases the potential for flooding. The Debtor has no funds to construct these basins.

## BACKGROUND REGARDING THE RESTRUCTURING

14.     The Project was calculated to be attractive to middle income homebuyers. The sub-prime crisis of 2008 has created conditions in which there is very little market appetite for the homes which were to be built on the Project site.

15.     In 2009, Anaverde's representatives discovered that a spur of the San Andreas Fault runs through the Project, rendering infeasible much of the development anticipated at the site.

16.     In light of the foregoing and other factors, the fair market value of the project is now approximately $13 million.

17.     Anaverde's existing secured lender, Cadim Note, Inc. ("Cadim") is owed approximately $63.9 million which loan has been in payment default for over 10 months. In

addition, Anaverde has numerous other creditors, some of which have filed mechanics' liens against the property and lawsuits against Anaverde.

18. A development of the Project will require significant change in the development plan and the investment of large amounts of additional capital. In view of the project's now-limited fair market value and the enormous amount of senior liens encumbering the property, Anaverde is no longer able to attract capital to develop the Project.

19. As explained in further detail herein, there are similarly undeveloped residential projects adjacent to the Project, which have been in bankruptcy for extended periods with no successful sales of the properties. The Debtors' inquiries with respect to such a possibility have all met with no success. This strongly indicates that there is virtually no likelihood of a sale to a third party not already involved in the Project.

20. Anaverde advised Cadim that it was considering filing for bankruptcy protection. A series of discussions and negotiations followed between Anaverde, Anaverde's equity investors, and Cadim in an attempt to reach an agreement as to how to proceed with such a bankruptcy filing.

21. Cadim, Anaverde, and Anaverde's equity investors have reached an agreement whereby Anaverde would file for bankruptcy and seek to confirm a plan of liquidation that would be funded by a sale of Anaverde's assets pursuant to 11 U.S.C. §363, free and clear of all liens, to New Anaverde, an entity formed by some of Anaverde's equity investors. Cadim would support a Sale Transaction and Plan from which, notwithstanding its senior security position, it would take only a maximum of about $12 million, waive its unsecured claims, and gift $350,000 to the other unsecured creditors.

22.     More specifically, pursuant to the Plan Support Agreement, Anaverde agreed to, among other things:

    **A.**     File and pursue the Plan which provides for payments to Cadim on account of Cadim's Secured Claim equal to the sum of:

    (1)     $10,475,000 from the Sale Transaction;[1]

    (2)     an amount equal to 12% per annum, compounded annually, on $10,125,000 from December 24, 2009 until $10,125,000 is disbursed to Cadim, but in no event more than $948,699;

    (3)     Unreimbursed reasonable fees and expenses of Cadim's counsel incurred by Cadim in pursuing the plan, but in no event more than $383,000; and

    (4)     A "schmuck insurance" right, payable in the future if at all, to 25% of the cash profits from sales of land included in the Project which (i) are received by the Buyer during the two-year period following consummation of the plan, and (ii) exceed the sum of (a) $26,700,000;(b) the amount paid under 22.A.(2); (c) any other amounts paid by the Buyer under the Plan and/or Sale Transaction not listed, (d) the amount advanced by New Anaverde under the DIP Credit Facility, (e) any other amounts paid by New Palmdale under the Plan and/or Sale Transaction, and any other out-of-pocket costs or investments by Debtor, FCP, or Buyer after November 30, 2009, which are related to the Project. Due to the state of the real estate market, this option is thought to be of only nominal value.

    **B.**     So long as the conditions of the Plan Support Agreement are satisfied, Cadim, agreed:

    (1)     to gift to the unsecured creditors (i.e., the members of the Convenience Class and the General Unsecured Creditors), $350,000 of cash proceeds from the Sale Transaction which would otherwise be payable to Cadim for its Secured Claim,

---

[1] Cadim has agreed to gift to the unsecured creditors (i.e., the members of the Convenience Class and the General Unsecured Creditors), the next $350,000 of cash proceeds from the Sale Transaction which would otherwise be payable to Cadim for its Secured Claim.

    (2)    that it will support and vote in favor of the Plan,

    (3)    to credit bid as much of the Cadim Loan as New Anaverde shall request,

    (4)    waive the right to receive any further payment with respect to its claims against Anaverde,

    (5)    release any liens or security interests it has in the Anaverde assets,

    (6)    accept, in full satisfaction, settlement, release and discharge of Cadim's Secured Claims, the Cadim Payment.

23.    On January 15, 2010, the Debtor filed its Plan of Liquidation (the "Plan") and Disclosure Statement with respect thereto (the "Disclosure Statement"). The Debtor's Plan contemplates that, following a Sale Process, a Sale Transaction will be approved by the Court in conjunction with approval of the Disclosure Statement and will be implemented through the Plan.

24.    Anaverde believes that this Plan represents the best option available to it in light of the current markets and the Project's need for funding.

## NECESSITY OF PROMPT SALE

25.    As of January 8, 2010 the Debtor has cash and cash equivalents of only about $114,000 and, subject to final approval of the final order by the Court, has an additional $700,000 of Post-Petition Financing available. The Debtor estimates that its cash and cash equivalents and the remaining financing available under the Post-Petition Financing will be sufficient to meet its cash needs through the completion of the Sale Process in April 2010. Absent the Post-petition financing, which expires on May 1, 2009, Anaverde cannot fund its post-petition operations and obligations. As a result, time is of the essence in completing the Sale Process and concluding the Chapter 11 process.

26. Anaverde ran out of capital before all site stabilization activities necessary for the site to avoid damage by the elements were completed. If this restructuring is not promptly concluded, there may be further damage to the site, eroding its fair market value even further and making a restructuring even more difficult.

27. To assure meeting these deadlines, it is necessary to commence the sale process immediately.

## PRE-PETITION AND POST-PETITION MARKETING EFFORTS

28. As noted above, the residential real estate market in the Palmdale area is in extremely bad condition.

29. An undeveloped project adjacent to the Project, owned by Palmdale Hills Property LLC, has been in bankruptcy since November 2008. The Palmdale Hills project has approval for 7200 residential units. The Debtor in Palmdale Hills has not consummated any transaction for the sale of the Palmdale Hills project and remains in Chapter 11 proceedings.

30. Another undeveloped 900 acre project, Joshua Ranch, is across the street from the Project. The developer of Joshua Ranch defaulted on its loans and the Federal Deposit Insurance Corporation, which had taken over the failed lender, foreclosed on the property within the last year. There has been no sale of this undeveloped land.

31. In the last two years, there have been virtually no sales of undeveloped land of any kind in the Palmdale, California area, other than lender foreclosures and deed in lieu transactions. There have been no sales of large undeveloped tracts such as the Project in the area in the last two years.

32. It is widely known that Anaverde is in default of its obligations to the Cadim and yet no party has approached the Debtor to inquire about acquisition of the property.

33.     Representatives of the Debtor have sought expressions of interest in the Project from five real estate developers, namely, Pulte Homes, Shea Homes, The New Home Company, Standard Pacific Homes, Tri Pointe Homes, but all have expressed no interest in the property or even in purchasing portions (bulk sales) of the project.

34.     In light of the foregoing, the Debtor believes that all further attempts at marketing the property outside the context of a §363 sale will be futile.

## THE PROPOSED SALE

35.     The Debtor proposes to sell the Assets to the Stalking Horse Purchaser or bidder with the highest or otherwise best bid free and clear of liens, claims, encumbrances and other interests, with such liens, claims, encumbrances and other interests to attach to the proceeds of the Sale.

36.     The following paragraphs in this section summarize key provisions of the Agreement, but are qualified in their entirety by reference to the Agreement (attached hereto as Exhibit D):

**A.**     Acquired Assets:     The Stalking Horse Purchaser will purchase substantially all of the Debtor's assets (the "Assets") related to the Project except for the Excluded Assets.

**B.**     Purchase Price:     **(i)** $10,475,000 cash;[2] plus **(ii)** an amount equal to 12% per annum, compounded annually, on $10,125,000 from December 24, 2009 until $10,125,000 is disbursed to Cadim, but in no event more than $948,699; plus **(iii)** Cadim's unreimbursed expenses, but in no event more than $383,000; plus **(iv)** A right, payable in the future if at all, to 25% of the cash profits from sales of land included in the Project which (1) are received by the Buyer during the two-year period following consummation of the Plan, and (2) exceed the sum of (a) $26,700,000;(b) the amount paid under 22.A.(2), (c) any other amounts paid by the Buyer under the Plan and/or Sale Transaction not listed in the prior subsections, (d)

---

[2] Cadim has agreed to gift to the unsecured creditors (i.e. the members of the Convenience Class and the General Unsecured Creditors), the next $350,000 of cash proceeds from the Sale Transaction which would otherwise be payable to Cadim for its Secured Claim.

the amount advanced by New Palmdale under the DIP Credit Facility, (e) any other amounts paid by New Palmdale under the Plan and/or Sale Transaction, and any other out-of-pocket costs or investments by Debtor, FCP, or Buyer after November 30, 2009, which are related to the Project, or listed in the prior subsections, and **(v)** Assumed Liabilities as set forth in the Agreement (collectively, the "Purchase Price").

   **C.** <u>Deposit:</u> The Stalking Horse Purchaser has not provided a deposit. In lieu of a deposit, the Stalking Horse Purchaser is providing DIP financing through the DIP Credit Facility to ensure the continued operations of the Debtor.

   **D.** <u>Expense Reimbursement/ Breakup Fee:</u> The documented actual, reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the Stalking Horse Purchaser in connection with the negotiation, documentation and implementation of the Agreement and the transactions contemplated by it and all proceedings incident thereto (the "Expense Reimbursement") plus a fee of $250,000 (provided that the Expense Reimbursement and said fee, in the aggregate, shall not exceed $300,000) is payable to Stalking Horse Purchaser if Debtor Closes a Sale of the Assets to any party other than the Stalking Horse Purchaser (collectively with the Expense Reimbursement, the "Breakup Fee").

   **E.** <u>Closing and Other Deadlines:</u> Conditional upon satisfaction of conditions precedent set forth in the Agreement.

   **F.** <u>Release of Claims:</u> The Agreement provides for a release of claims and causes of action against the Stalking Horse Purchaser.

## RELIEF REQUESTED

  37. The Debtor has determined that it is in the best interests of the Debtor's estate to solicit and enter into a Sale Transaction with a willing and qualified bidder, of all or substantially all of the assets of Anaverde in connection with the Plan that will be prosecuted in this case. In addition, entry into the Sale Transaction is anticipated to be highly advantageous, as it is expected to provide a fair valuation of the Debtor and to provide the capital necessary for the Debtor to confirm and implement the Plan.

  38. Pursuant to the Procedures Motion, the Debtor seeks the entry of the Sale Procedures Order: (a) approving the Sale Procedures, including the Breakup Fee as set forth below and in the Agreement between the Debtor and the Stalking Horse Purchaser, with respect to the Sale, (b) scheduling and/or setting: (i) the deadline for submitting bids pursuant to the

Bidding Procedures to be April 7, 2010 at 12:00 noon prevailing Eastern time, (ii) the Auction pursuant to the Sale Procedures to commence at approximately 10:00 a.m. prevailing Eastern time on April 12, 2010 at 10:00 a.m. prevailing Eastern Time, (iii) the deadline for filing and serving objections to the Motion to Approve the Sale (the "Sale Motion")[3] to be April 13, 2010 at 12:00 p.m. prevailing Eastern time, and (iv) the Sale Hearing (as defined in the Sale Procedures) on or before April 19, 2010.

## PROPOSED SALE PROCEDURES

39.     The Debtor seeks the greatest value for the Assets. The proposed Sale Procedures were developed consistent with the Debtor's need to expedite the sale process and with the objective of promoting further active bidding that will result in the highest and best offer the marketplace can sustain for the Assets while affording appropriate protection to the Stalking Horse Purchaser. The proposed Sale Procedures reflect the Debtor's goal of conducting the Auction in a controlled, fair and open fashion that promotes interest in the Assets by any financially-capable, motivated bidders who are likely to close a Sale Transaction.

40.     The proposed Sale Procedures, including the Bidding Procedures, are attached hereto as Exhibit A. The following is a summary of the pertinent terms of the Sale Procedures.[4]

41.     Promptly following the filing of this Procedures Motion, the Debtor sent, by overnight delivery, a copy of this Motion to all parties identified by the Debtor and its professionals as likely to have an interest in participating in sale of the Debtor's assets, so that

---

[3] The Sale Motion will be filed upon Court approval of this Procedures Motion.

[4] The Sale Procedures should be reviewed in their entirety and bidders and parties in interest should not rely on this summary. Capitalized terms not defined herein have the meanings ascribed to such terms in the Sale Procedures.

1/14/10 10:20 PM

such parties will have more than adequate time to perform any necessary due diligence and participate in the Sale Process. All parties that have requested notice pursuant to Rule 2002 in this case will also be sent a copy of this Motion by United States first class mail.

42.     **Actions Leading Up to the Submission of Bids:** Until five (7) days prior to the Auction, the Debtor will qualify potential bidders ("Bidders") according to their financial qualifications to consummate a Sale Transaction. All potential Bidders will be required to complete and execute a confidentiality agreement satisfactory to the Debtor prior to conducting any due diligence. Bidders having initially satisfied the Debtor as to their financial qualifications to consummate a Sale Transaction and having executed a confidentiality agreement with the Debtor generally will be allowed to perform reasonable due diligence, including being granted reasonable access to the books, records and executives of the Debtor. Any party wishing to take part in this process would begin by contacting the Debtor, using the contact information set forth in the Bidding Procedures.

43.     Upon the submission by a Bidder of a written, non-binding expression of interest to the Debtor describing the terms of the Sale Transaction that the Bidder would be proposing (including assets to be purchased, price and other material terms and conditions), the Debtor will circulate to such Bidder a word version of the Agreement, as executed by the Debtor and the Stalking Horse Purchaser (the "Form of Agreement"), and will be prepared to commence discussions and, if appropriate, negotiations regarding the terms of such Bidder's proposal Prospective Bidders are encouraged to begin discussions and, if appropriate, negotiations with the Debtor well in advance to the deadline for the submission of bids set forth below.

44. **Deadline for Submission of Bids:** Any Bidder that wishes to take part in the Sale Process must submit a written bid (a "Bid") so as to be received by the Notice Parties on or before April 1, 2010 at 12:00 noon (prevailing Eastern Time) (the "Bid Deadline").

45. **Form of Bid:** The Bid must be submitted in a form substantially consistent with the Form of Agreement and must include a black-lined copy of the Agreement (the "Modified Agreement") that shows all changes requested by the Bidder. A Bid must contain, at a minimum, a memorandum detailing the assets to be purchased, the form of consideration (cash, notes, etc.) to be provided to satisfy the purchase price, any conditions to the Bidder's obligation to purchase such assets, evidence of the Bidder's ability to consummate the Sale Transaction and confirmation by such Bidder that the Sale Transaction reflected in its Bid is not contingent upon financing or additional due diligence.

46. Each Bid shall be for all of the Assets.

47. Each Bid shall have an initial minimum bid requirement equal to the sum of (i) the Purchase Price, (ii) the Breakup Fee, and (iii) $100,000 (the "Minimum Initial Bid")

48. In addition, all Bids must be accompanied by a draft Purchase Agreement (hard copy and electronic version in Microsoft Word) reflecting the applicable Bid and the other terms and conditions of the Sale Transaction proposed by the Bidder, which Purchase Agreement shall be prepared utilizing the Form of Sale Agreement. The Debtor reserves the right to request from all Bidders an earnest money deposit of $250,000, which shall be held in escrow and shall not become property of the Debtor's estate pending the Approval Hearing. To the extent so requested, the earnest money requirement would be applied to all parties submitting Bids. Such deposit shall be nonrefundable if the Bidder is designated as the Winning Bidder (defined below)

and fails to close. The Debtor may refuse to consider any Bid that does not strictly comply with the terms set forth above.

49.     The Debtor and all other entities shall keep each such Bid confidential in accordance with the applicable confidentiality agreement, with access restricted to the Debtor, its professionals, the Creditors Committee, if any, and the Office of the United States Trustee. However, Bids may be revealed to any other entity at the option of the Debtor, and are expected to be revealed during the Auction. The Debtor may request additional information from a Bidder (whether previously qualified or not) in order to evaluate the Bidder's ability to consummate a Transaction and to fulfill its obligations in connection therewith, and such Bidder shall be obligated to provide such information as a precondition to participating further in the Sale Process.

50.     **Selection of Qualified Bidders:** By 2:00 p.m. prevailing Eastern time three (3) business days prior to the Auction, the Debtor shall notify each party that submitted a Bid either that its Bid (i) satisfies the requirements of the Bidding Procedures, and therefore that it may be a "Qualified Bidder" authorized to participate in the Auction, or (ii) does not satisfy the requirements of the Bidding Procedures such that it would not be beneficial to the Debtor's estate to further consider the Bid, and thus such party will not be a Qualified Bidder and will not be allowed to take part in the Auction. However, if a party approaches the Debtor prior to the commencement of the Auction without having submitted a Bid, but is able to establish its financial wherewithal to consummate a Sale Transaction and is willing to make an offer on substantially the same terms as those set forth in a previously proposed Sale Transaction which the Debtor has deemed a Qualified Bid, the Debtor may deem such party to have provided a Bid such that it may take part in the Auction.

51.    **Auction and Selection of Winning Bid:** The Debtor will convene a meeting of all Qualified Bidders that have been notified that they are entitled to participate in accordance with the Bidding Procedures at 10:00 a.m., prevailing Eastern time, on April 12, 2010, or such later date as the Debtor may set, at the offices of Cross & Simon LLC, 913 N. Market St., 11th Floor, Wilmington, DE 19899-1380.

52.    If, no Qualified Bid, other than the Stalking Horse Purchaser is received by the Bid Deadline, the Debtor will report the same to the Bankruptcy Court, cancel the Auction, declare the Stalking Horse Purchaser the Winning Bidder and will proceed to seek entry of an order approving the sale of the Assets pursuant to the terms of the Agreement.

53.    This Auction will begin with the Debtor's presentation of the then existing highest and best Bid, as determined by the Debtor (the "Baseline Bid"). All other Qualified Bidders shall then be entitled to propose a superior Sale Transaction, by providing higher and better bids than the initial best Bid. An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. Any Overbid must be made in increments of at least $100,000 over the previous highest or otherwise best bid. Despite the terms of any other Bid, the Debtor reserves the right to (i) declare the precise terms and conditions of a single proposed Sale Transaction to be the then existing highest and best Bid; (ii) declare that all further Bids made at the Auction be on the basis of a specified form or structure of a Sale Transaction reflected in an Initial Best Bid or in any other form or structure that the Debtor specifies; and (iii) declare the bidding at the Auction closed.

54.    **Stalking Horse Agreement and Deal Protections:**    The Agreement contemplates bid protections in the form of a Breakup Fee. The Debtor seeks to provide such

Breakup Fee in recognition of the Stalking Horse Purchaser's substantial expenditure of time, energy, and resources, and the benefits to the Debtor's estate of securing a "stalking horse" or guaranteed minimum bid. The Breakup Fee is required by the Agreement.

55.     By this Motion, the Debtor seeks authority, if required pursuant to the terms of the Agreement to reimburse up to pay the Stalking Horse Purchaser: (i) documented actual, reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the Stalking Horse Purchaser in connection with the negotiation, documentation and implementation of the Agreement and the transactions contemplated by it and all proceedings incident thereto plus (ii) a $250,000 fee, provided that the expense reimbursement and said fee, in the aggregate, shall not exceed $300,000. If approved, the Breakup Fee will be paid to the Stalking Horse Purchaser pursuant to the terms of the Agreement. In addition, the Stalking Horse Purchaser shall have the ability to credit bid the Breakup Fee, including the Expense Reimbursement.

56.     **Determination of Winning Bid:** Following the Auction, the Debtor shall determine in good faith based upon all factors it deems relevant which Bid constitutes the highest and best Sale Transaction, in determining the Winning Bidder, the Debtor will consider various factors including, but not limited to: (i) the Debtor's ability to satisfy the conditions to closing the Sale Transaction, (ii) the inherent valuation of the Debtor that such Bid represents, (iii) the time required to consummate the Sale Transaction contemplated by the Bid, (iv) other terms of the Bid, in light of the impact on the Debtor and the likelihood of and timing of closing, and (v) the ability of the Bidder and the Debtor to consummate the Sale Transaction and confirm the Plan within a timeframe consistent with the Debtor's budget and projections.

57. **Notice of the Winning Bid:** Within one day after adjournment of the Auction, the Debtor will transmit a notice of the Winning Bid by telecopy, electronic mail transmission, or overnight delivery, to the following entities only: (i) the Office of the United States Trustee; (ii) counsel to the Creditors Committees; (iii) any party that requests in writing that it be sent such a notice; and (iv) any other entities the Debtor desires to receive notice.

58. **Hearing to Approve the Results of the Sale Process:** The Debtor requests that the Court convene the Approval Hearing to approve the Sale Transaction, which will be implemented through the Plan, with the Winning Bidder on April 19, 2010.

59. **Closing:** The closing on the Sale Transaction with the entity that submitted the Winning Bid would occur on the Effective Date of the Debtor's Plan.

60. **Failure to Obtain Court Approval of the Transaction:** If for any reason the Court does not approve a Sale Transaction with the Winning Bidder, the offeror of the second highest and best bid at the Auction, as determined by the Debtor, will automatically be deemed to have submitted the highest and best bid, and to the extent the Debtor consents, the Debtor and such offeror will be authorized and directed to effect the Sale Transaction with such offeror pursuant to the Plan. If such failure to gain Court approval is the result of a breach by the Winning Bidder, such breaching Bidder's deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all other available damages from the defaulting Bidder.

61. **Return of Deposits:** Within two (2) business days after the adjournment of the Auction, the deposits, if any, of all participating Bidders who are not the Winning Bidder or the second highest and best Bidder shall be returned.

62. **Reservation of Rights; Deadline Extensions:** The Debtor reserves its rights to: (i) impose, at or prior to the Auction, additional terms and conditions on any Sale Transaction; (ii) extend the deadlines set forth in the Bidding Procedures, adjourn the Auction, and/or adjourn the Approval Hearing in open court without further notice; and (iii) withdraw consideration of the Sale Transaction at any time prior to or during the Auction and make subsequent attempts to market the same.

63. In connection with the above listed Sale Procedures, the Debtor requests that the court set a date and time, again subject to this Court's calendar, to convene the Sale Hearing to approve the Transaction as the highest and best bid received as a result of the Sale Process. The Debtor respectfully requests that the Sale Hearing take place on April 19, 2010. The Debtor respectfully requests that the deadline to object to the results of the Sale Process be set for April 12, 2010 at 12:00 noon (prevailing Eastern Time).

64. The Debtor believes that these Bidding Procedures are necessary to establish an efficient bidding environment for the Sale Transaction, which will enable the Debtor and other parties in interest to review potential Qualified Bidders and proposed bids promptly, convene a productive Auction, and determine which bid is the best for the Debtor's estate.

## PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF ASSUMED EXECUTORY CONTRACTS

65. As noted above, pursuant to the Sale Motion, the Debtor may seek to assume certain executory contracts and unexpired leases to be identified on schedules to the Agreement, other than those executory contracts and unexpired leases excluded by the Winning Bidder pursuant to its Agreement with the Debtor (the "Assumed Executory Contracts").

66.    The Debtor will serve the Sale Motion and the *Notice to Counterparties to Executory Contracts and Unexpired Leases That May be Assumed and Assigned* (the "Cure Notice") in substantially the form of **Exhibit B** hereto upon each counterparty to the Assumed Executory Contracts. The Cure Notice shall state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.    The Cure Notice also shall identify the amounts, if any, that the Debtor believes are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").    If a contract or lease is assumed and assigned pursuant to this Court's order approving same, then unless, the Assumed Executory Contract counterparty properly and timely files and serves an objection to the Cure Amount contained in the Cure Notice, the Assumed Executory Contract counterparty shall receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the Agreement, as executed and delivered at closing by the Debtor.    If an objection is filed by a counterparty to an Assumed Executory Contract, the Debtor proposes that such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount, if any, specified by the Debtor in the Cure Notice.

67.    If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract, the Debtor proposes that the counterparty must file the objection by no later than (i) 12:00 p.m. prevailing Eastern time on April 12, 2010, or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after

the Sale Hearing); *provided, however,* that any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Winning Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.

68.     The Winning Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, as shall be provided in the Sale Motion. The Debtor proposes that the Court make its determination concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing. Cure Amounts disputed by any counterparty shall be resolved by the Court at the Sale Hearing.

69.     Except to the extent otherwise provided in the Agreement with the Winning Bidder, subject to the payment of any Cure Amounts, the assignee of the Assumed Executory Contracts shall not be subject to any liability to the assigned contract counterparty or lessor that accrued or arose before the closing date of the sale and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

## BASIS FOR RELIEF

*A.     Approval of Sale Procedures*

70.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor in possession is given these rights by Section 1107(a) of the Bankruptcy Code. See 11 U S.C. § 1107(a).  Moreover, Section 105(a) of the Bankruptcy Code provides that the bankruptcy courts "may issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

71.     The paramount goal for any proposed sale of property of a bankruptcy estate is to maximize the proceeds received by the estate. See, e.g.. *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 B.R. 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is well-established principle of bankruptcy law that the objective of bankruptcy sales and the Debtor's duty with respect to such sales is to obtain the highest price or overall greatest benefit possible for the estate.") (quoting *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

72.     Courts in this Circuit have held that a sale of all of a debtor's assets pursuant to section 363 of the Bankruptcy Code is appropriate where the transaction represents a reasonable business judgment on the part of the Debtor. *See In re Tempo Technology Corp.*, 202 B.R. 363 (D. Del. 199), *aff'd without opinion,*141 F.3d 1155 (3d Cir. 1998). A debtor in possession's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor in possession. *See Official Committee of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2nd Cir. 1992) (holding that a court determining a section 363(b) application must find from the evidence presented before it a good reason to grant such application); *see also Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbots Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (2d Cir. 1986); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Liionel Corp.)*, 722 F.2d 1063, 1071 (2d cir. 1983); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) ("The sale of assets which is not in the debtor's ordinary course of business

requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith."), *citing In re Delaware & Hudson Railway Co.,* 124 B.R. 169, 176 (D. Del. 1991).

73.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)). Thus, absent a showing of bad faith, self-interest, or gross negligence, courts will uphold a board's decision as long as they are attributable to any rational business purpose. *Id.* at 656.

74.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Res.,* 147 B.R. at 659 (such procedures "encourage bidding and maximize the value of the debtor's assets"); *In re Financial News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.")

75. Courts accord a debtor substantial deference in formulating procedures for selling assets. See, e.g., Official *Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources. Inc.),* 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements negotiated by a debtor subject to review under the deferential "business judgment" standard and that such procedures generally are "presumptively valid") (affirming *Integrated Resources,* 135 B.R. 746 (Bankr. S..D.N.Y. 1992)), appeal dismissed. 3 F.3d 49 (2d Cir. 1993); *In re 995 Fifth Ave. Assoc. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

76. Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of a debtor's assets, see, e.g., *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986), such as structuring an orderly sale process with or without a "stalking horse." Here, the Debtor contemplates the sale of all or substantially all of its assets, in each case pursuant to the Plan, and seeks authority to enter into a Transaction determined to be the highest and best bid achieved as a result of the Sale Process.

77. The Sale Procedures are fair and reasonable procedures that are intended to encourage competitive bidding. The Debtor believes that all of the Sale Procedures proposed herein will increase the likelihood that the Debtor will receive the greatest possible consideration for its assets because they will ensure a competitive and fair bidding process. They also allow the Debtor to undertake the Sale Process in as expeditious a manner as possible, which the Debtor believes is essential to maximizing the value of the estate.

78. The Debtor submits that the proposed Sale Procedures are reasonable under the facts and circumstances of these cases. The Debtor believes that the approval of the Sale Procedures provide the Debtor with the best possibility of maximizing the value of the Debtor's assets for the benefit of creditors, and, accordingly requests that the Court approve the Sale Procedures.

*B. Notice of the Sale Process and the Approval Hearing*

79. Under Bankruptcy Rules 2002(a)(2) and (c), the Debtor is required to notify, inter alia, all of its creditors of a proposed sale of its assets outside of the ordinary course of business, including a disclosure of the time and place of a public sale, the terms and conditions of a private sale, and the deadlines for filing any objections. The Debtor submits that the Notice of Sale Process and Approval Hearing attached as **Exhibit C** contains the types of information required under Bankruptcy Rule 2002(c) and would provide adequate notice of the Sale Procedures, Sale Process, Auction Date and Sale Hearing and thus requests that this Court approve the form, manner and the content of the Notice of Sale Process and Approval Hearing.

80. Moreover, the Debtor's publication of the form of notice attached hereto as Exhibit C in the Wall Street Journal, National Edition, will likely alert the other relevant parties that may be interested in taking part in the Sale Process. The Debtor proposes to publish such notice with fifteen (15) days of approval of this Motion.

81. The Debtor also submits that the form of Cure Notice, substantially in the form attached hereto as **EXHIBIT B**, would provide adequate notice of the potential assumption and assignment of executory contracts and unexpired leases and cure amounts to contract counterparties and lessors, and should therefore be approved.

*C. The Bid Protections are Reasonable and Appropriate*

82. Approval of the Breakup Fee is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) [hereinafter *In re O'Brien*]. In *In re O'Brien*, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien*, 181 F.3d at 535. Here, the Breakup Fee should be approved because they will provide a benefit to the Debtor's estate.

83. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id* at 537. Second, if the availability of an expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*

84. In *In re O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee or expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales

configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien*, 181 F.3d at 536.

85.     After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case. *See In re Chi-Chi's Inc.*, Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); *In re Riverstone Networks*, Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); *In re Radnor Holdings,* Case No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *Tama Beef Packing, Inc.,* 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); *In re Great Northern Paper, Inc.*, Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld).

86.     Whether evaluated under the "business judgment rule" applied by many courts or the Third Circuit's "administrative expense" standard, the Breakup Fee should be approved because it is necessary to obtain the maximum return for the benefit of the Debtor's estate. Moreover, all negotiations between the Debtor and the Stalking Horse Purchaser have been conducted on a good faith, arm's-length basis. The Debtor's ability to continue to shop the Assets for a higher or better offer without risk of losing the Stalking Horse Purchaser, a "bird-in-

the-hand", would be eliminated if the Debtor is not authorized to remit the Breakup Fee. Therefore, absent authorization of the payment of the Breakup Fee, the Debtor might lose the opportunity to obtain the highest and best available offer for the Acquired Assets and the downside protection that will be afforded by the Agreement.

87.     Payment of the Breakup Fee is not likely to diminish the Debtor's estate, rather the Agreement and the Stalking Horse Purchaser's offer will form the basis upon which other bids will be submitted and evaluated. The establishment of the Breakup Fee permits the Debtor to insist that competing bids for the Acquired Assets be higher or otherwise better than the purchase price under the Agreement, which is a clear benefit to the Debtor's estate. Thus, even if the Stalking Horse Purchaser is offered the Breakup Fee and is ultimately not the Winning Bidder, the Debtor will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Acquired Assets are sold reflects their true worth.

88.     Given the exigencies of the Debtor's financial condition and the current state of the national credit markets, the Breakup Fee is not only necessary, but reasonable. Paying a Breakup Fee of up to $300,000 is reasonable since the Stalking Horse Purchaser's bid includes, among other things, an emergency DIP loan, the payment of all cure amounts and the payment of cash. In light of the benefit to the Debtor's estate that will be realized by having a signed purchase agreement, enabling the Debtor to preserve the value of its estate and promote more competitive bidding, ample support exists for the approval of the Breakup Fee.

89.     The Debtor's payment of the Breakup Fee under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtor's estate,

within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtor's estate; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Purchaser.

90.     The Debtor believes that it has demonstrated a sound business justification for authorizing the Breakup Fee and its clear necessity and benefit to these estates. Thus, the Debtor requests that this Court approve and authorize payment of the Breakup Fee, pursuant to the terms of the Agreement.

91.     The Debtor also reserves its rights to amend or revise the Bidding Procedures prior to the entry of the Order thereon.

## NO PRIOR REQUEST

92.     No prior request for the relief sought in this Sale Procedures Motion has been made to this or any other court.

## NOTICE OF THIS MOTION

93.     Notice of this Motion has been given to (i) the United States Trustee, (ii) counsel to the Post-Petition Financing lenders, (iii) counsel to the Creditors Committee, (iv) all parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002, (v) any party that has expressed an interest in a Transaction, and (vi) all parties known to assert a security interest in property of the Debtor. In light of the nature of the relief requested, the Debtor submits that, except as set forth above, no further notice need be given.

94.     WHEREFORE, the Debtor respectfully requests that the Court (i) enter an order, substantially in the form annexed hereto, approving the Sale Procedures and approving the form

and manner of notice of the Sale Process and (ii) grant such other and further relief as is just and proper.

Dated: January 15, 2010

CROSS & SIMON, LLC

_[signature]_

Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
913 N. Market St.
11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
Ph: (302) 777-4200
Fax: (302) 777-4224
kmann@crosslaw.com

*Proposed Counsel for Debtor and Debtor in Possession*